UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

| | | |
|---|---|---|
| CHRISTOPHER FREEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-CV-57-CHB |
| | ) | |
| v. | ) | |
| | ) | |
| MARSHALL COUNTY FISCAL | ) | **MEMORANDUM OPINION** |
| COURT, *et al.*, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Marshall County Fiscal Court ("Marshall County"), Commissioner Kevin Spraggs, Sheriff Eddie McGuire, and County Attorney Jason Darnall. [R. 89]. Plaintiff Christopher Freeman responded in opposition [R. 98], and the Defendants replied [R. 100]. For the reasons that follow, the Court will grant the Defendants' Motion.

## I.   BACKGROUND

Plaintiff Christopher Freeman, who suffers from bilateral hearing loss, served as the 911 Director in Marshall County, Kentucky, from May 2019 until approximately March 9, 2023. [R. 79 (Freeman Deposition, Vol. 1), p. 80, subp. 316]. However, the end of Freeman's employment is disputed by the parties. Freeman suggests that the County terminated his employment while he was on medical leave and that he learned of his termination through a text message from a third-party vendor. *Id.* at p. 73, subpp. 286–87. The Defendants suggest, however, that Freeman abandoned his post by cleaning out his office and turning in his keys prior to taking medical leave, listing his home for sale and moving out of the County, and filing for disability retirement and

unemployment. *See* [R. 89, p. 16][1] (citing [R. 79 (Freeman Deposition), pp. 276, 277, 383]) ("Freeman claims that Marshall County terminated him, but the record clearly indicates that Freeman abandoned his employment with the County.").

From the outset of his time in Marshall County, Freeman had tumultuous relationships with other County executives and personnel. In early 2019, after the former 911 Director vacated her position, Freeman applied for the role. Freeman was interviewed first by a panel of County executives, including then-Judge Executive Kevin Neal, Sheriff McGuire, County Attorney Darnall, and a Marshall County citizen, Mickey Sorrells. [R. 79 (Freeman Deposition, Vol. 1), p. 17, subp. 63]. Freeman had a follow up interview with all Marshall County Fiscal Court members, including Commissioner Spraggs. *Id.* at subp. 64. During the initial hiring process, Commissioner Spraggs voted against hiring Freeman, citing the $30,000 salary increase from the previous 911 Director as the reason for his lack of support. [R. 87 (Spraggs Deposition), p. 8, subp. 25]. Commissioner Spraggs was outvoted, however, and Freeman assumed the role of 911 Director in May 2019. [R. 79 (Freeman Deposition, Vol. 1), p. 15, subp. 57].

Around the time of Freeman's hire, Marshall County was breaking ground on a regional E-911 center that could serve up to five counties. *Id.* at p. 20, subp. 75. Well before Freeman's involvement with the project, Commissioner Spraggs opposed plans to build the regional center, as he believed funding should first go toward fixing "radio issues." [R. 87 (Spraggs Deposition), p. 28, subp. 104]. When Freeman took over as 911 Director, some of his duties were to "[b]uild this new center," generate funding for it, "and try to regionalize and consolidate with other communities." [R. 79 (Freeman Deposition, Vol. 1), p. 20, subp. 76]. Freeman thus proposed a $7 fee on property within the County, and the Fiscal Court passed his proposal. *Id.* at p. 37, subp. 143.

---

[1] For clarity, the Court notes that it cites the CM-ECF page numbers, and not the internal page numbers, of this record entry.

Even so, members of the public voiced disapproval of the fee. *See id.* at subp. 138 ("Q. Well, you would agree, though, that the public outcry about this fee was pretty negative, correct? [Freeman:] Some people were negative about it, yeah[.]"). Other County officials also opposed Freeman's "model budget" presented during an August 26, 2019 Fiscal Court special meeting, which contemplated raising the 911 budget to $1.9 million from $825,700 the previous year. *Id.* at p. 32, subpp. 125–26. Despite numerous disagreements over funding, the regional center was ultimately constructed and became operational around July 2022. [R. 79 (Freeman Deposition, Vol. 1), p. 67, subpp. 264–65].

During Freeman's tenure as 911 Director, other individuals, including some of Freeman's own 911 dispatchers, also questioned his fiscal responsibility. When asked about Freeman's "spending habits" during her deposition, one dispatcher, Rachael Opiola, described them as "good" "[a]t the beginning," because Freeman "actually gave [dispatchers] more training opportunities, which did cost the County some of the budget, but that was to, you know, help [them] be better dispatchers." [R. 81 (Opiola Deposition), pp. 13–14]. "But," she continued, "then when it came to our new center to get everything ready, it seemed very extravagant spending and maybe a little bit too much, in my opinion." *Id.* at 14. Similarly, when another dispatcher, Sheila Day, was asked her "opinions on the budgeting and spending habits" of Freeman, Day offered, "There was a lot of unnecessary spending. A lot of things that were purchased that did not need to be or could have been -- a different version could have been purchased that would have been a lot less expensive and just as, if not more, effective than what we have." [R. 84 (Day Deposition), p. 14].

At some point in the summer of 2019, "Commissioner Spraggs witnessed a car accident which, in the aftermath, raised questions about the County's radio communications and dispatch effectiveness." [R. 89, p. 6]. Freeman investigated the incident and determined "there was, in fact,

a very slow response from 911." [R. 79 (Freeman Deposition), p. 3, subp. 9]. Commissioner

Spraggs decided to visit the regional center on July 18, 2019, to listen to dispatch recordings

following the accident. *Id.* at subpp. 9–10; [R. 84 (Day Deposition), p. 9]. Commissioner Spraggs

listened to the recordings in the regional center's radio room, where Freeman, Dispatcher Opiola,

and Dispatcher Day were also present. [R. 89, p. 6]. At some point during his visit, Commissioner

Spraggs made one or more comments concerning an inability to adequately hear while in the radio

room. The parties dispute the nature of the comments, which in part form the basis of this lawsuit.

For his part, Freeman suggests Commissioner Spraggs made pointed, discriminatory

comments concerning Freeman's hearing loss:

> [Freeman:] Mr. Spraggs comes into the 911 center and asks a few questions about
> my hearing and whether there was a hearing standard for the job, you know, in 911.
> And that -- he made the statement that he was deaf in one ear and he couldn't do
> this job. He said I couldn't do this job being deaf in one ear. And, you know, I had
> never made it known to the county at that point that I was deaf in one ear.
>
> . . .
>
> Q. What comments about the hearing? What do you mean by that?
> A. He asked if there was a hearing standard.
> Q. Okay.
> A. For this -- he called it this job. There's not a hearing standard in the State of
> Kentucky for 911. He asked about -- you know, made the statement that he was
> also deaf in one ear and there was no way that he could do this job being deaf in
> one ear, which translates to me you know I'm deaf in one ear and you're saying the
> same thing about me.
> Q. Did he ever make a specific accusation that you are deaf in one ear?
> A. When he said that, that's what he was saying.
> Q. Did he ever make a specific accusation, Mr. Freeman, I know you're deaf in one
> ear?
> A. No, he did not say those words.

[R. R. 79 (Freeman Deposition), p. 4, subp. 10; p. 26, subp. 98]. Immediately following this

interaction, Freeman called Judge Executive Neal to report "the strangest thing [that] had just

happened" and to explain Commissioner Spraggs's comments. *Id.* at p. 27, subp. 102. During this

phone call, Judge Executive Neal informed Freeman of an anonymous letter the County had received on May 13, 2019, shortly after Freeman was hired, criticizing the county's decision to hire Freeman. *Id.* at subpp. 102–03. The letter "criticiz[ed] Mr. Freeman for his hearing disability and stat[ed] that he could not perform his job due to his disability." [R. 98-1 (Affidavit of Kevin Neal), p. 1]. On August 19, 2019, Freeman filed a formal complaint against Commissioner Spraggs based on his alleged comments. *Id.*; *see also* [R. 79, p. 26, subp. 101].

When asked about the comments during his deposition, Commissioner Spraggs stated that he did not recall making comments about a hearing standard in the 911 center but explained that he did not know Freeman had hearing loss at the time of his visit:

> Q. . . . So it says [Commissioner Spraggs] inquired about a hearing standard for 911 and made the statement that he was deaf in one ear and couldn't do this job. Do you recall that?
> A. Nope.
> Q. Okay. Do you have any hearing loss in one ear?
> A. I do.
> Q. Okay. And it says, "[Freeman] left the room to take a phone call, and [Commissioner Spraggs] asked about the hearing standard again to the employees working that day." Do you recall that?
> A. No, I do not recall that.
> Q. You are aware that Mr. Freeman has 90 percent hearing loss in his right ear. Are you not?
> A. I'm not aware of what his hearing loss is.
> Q. But you are aware he has some hearing loss?
> A. I am now, yes, through all this.
> Q. Okay. But not during his employment?
> A. Well, yeah. Some time during the employment, when I received a letter from Sizemore or whatever it was, or when Judge Neal did.

[R. 87 (Spraggs Deposition), p. 29, subpp. 108–09]. Commissioner Spraggs "vehemently denies any animus in the comment and maintains that it was a rhetorical reference to sheer volume in the radio room." [R. 89, p. 4]. During her deposition, Dispatcher Day described the comment as follows:

> [A]fter [the recording] was over, [Commissioner Spraggs] was just standing around talking, just having a conversation. It was loud in the room. And he had made a comment like conversationally something along the lines of wow, it's hard to hear in here, I'm hard of hearing, I don't know how you would -- how you would hear in a room like this, talking about his own hearing.

[R. 84 (Day Deposition), p. 10]. When asked about the incident, Dispatcher Opiola stated she did not overhear Commissioner Spraggs's comment at all, so she could not provide any insight into its nature. [R. 83 (Opiola Deposition), pp. 21–22].

Following the alleged comments by Commissioner Spraggs in the 911 center's video room, several other contentious incidents occurred between Freeman and County officials. In February 2020, a female dispatcher at the 911 Center filed a sexual harassment claim against a male sheriff's deputy. [R. 80 (Freeman Deposition, Vol. 2), p. 93]. Freeman forwarded the dispatcher's complaint via email to Deputy Judge Executive Brad Warning but did not otherwise participate in filing or processing the sexual harassment claim. [R. 79 (Freeman Deposition, Vol. 1), p. 53, subp. 208; p. 66, subp. 259]. Despite his limited involvement, Freeman suggests other County officials retaliated against him for bringing the sexual assault allegations to their attention. *See id.* at p. 66, subp. 261.

A few months later, around March or April 2020, after Freeman sent out an email requesting that people refrain from entering the dispatching center in the height of the COVID-19 pandemic, "a black trash bag was put over the 911 center door in a facility that [911 department employees] share bathrooms and a breakroom with." *Id.* at p. 45, subp. 174. Though Freeman perceived this as a hostile act toward his department, Sheriff McGuire explained that he placed the trash bag on the door "[t]o stop the spread of coronavirus" by "keep[ing] our two offices separate." [R. 86 (McGuire Deposition), p. 13, subp. 44].

On August 28, 2020, a petition of no confidence against Freeman, signed by approximately 100 first responders and their spouses, was initiated because of "[a] dangerously unreliable radio

communications network," "[d]evastated working relationship" with other agencies, "[l]imited to no discussions with agency heads regarding communications infrastructure and department needs," "[c]ommandeering radio systems without discussion from agencies involved," "exorbitant spending on unnecessary projects despite the desperate need for safe radio communications," and because "[e]mergency responders fe[lt] the attitude and performance of Marshall County E911 [was] at an all-time low which jeopardize[d] responder safety." [R. 85-8 (Petition), p. 2]. Freeman did not formally respond to the accusations levied in the petition, as he was advised by Judge Executive Neal not to. [R. 79 (Freeman Deposition, Vol. 1), p. 53, subp. 207]. Freeman believes the petition was "fabricated," that many were "misled into signing" it, and that the motives behind it were retaliatory. [R. 98, pp. 5–6]. Despite the petition, Freeman continued to serve as 911 Director.

In June 2021, Freeman's wife, on his behalf, filed an Occupational Safety and Health Standards complaint with the Kentucky Labor Cabinet (hereinafter, the "Kentucky OSHA" or "KOSHA" complaint) complaining of "broken chairs, extreme mold, and broken desks" in the 911 center. [R. 79 (Freeman Deposition), pp. 59–60, subpp. 233–36]. Thereafter, around November of 2021, Freeman took a medical leave of absence. [R. 79 (Freeman Deposition, Vol. 1), p. 67, subpp. 262]. While on leave, Freeman underwent cochlear implant surgery, which he admits made it difficult to be in the radio room and impossible to "do the physical dispatch job." *Id.* at p. 71, subp. 280.

Freeman returned from medical leave in March of 2022, before taking a second medical leave of absence beginning November of 2022. *Id.* at p. 68, subp. 267; p. 69, subp. 272. Freeman applied for disability retirement in November of 2022, and his application was granted in early 2023. *Id.* at p. 71, subp. 281. Freeman also filed for unemployment on January 23, 2023. *Id.* at p.

73, subpp. 287–89. On March 9, 2023, Freeman "was told via a text message from a vendor in the 911 industry that the county had sent out e-mails to the people saying that [he] was no longer employed." *Id.* at subp. 286.

Freeman filed an Equal Employment Opportunity Commission ("EEOC") claim against the County in September 2021, which ultimately issued a Right to Sue Letter on February 24, 2022. *Id.* at p. 64, subp. 251; p. 68, subp. 268; [R. 1-1 (Right to Sue Letter)]. Shortly thereafter, on May 3, 2022, Freeman initiated this action. [R. 1]. By both the Defendants' and Freeman's account, at the time Freeman initiated this action, he was still employed with the County. The Defendants suggest "[t]he last day Freeman worked for Marshall County was November 22, 2022," [R. 89, p. 18], and Freeman suggests he was terminated on or around March 9, 2023, [R. 98, p. 12].

On April 25, 2023, after seeking leave of Court to do so, Freeman filed his Third Amended Complaint. [R. 56]. Freeman asserts claims of disability discrimination against Marshall County (Count I), *id.* at ¶¶ 70–72; retaliation under "Title VII & KRS 344 & ADA" against Marshall County (Count II), *id.* at ¶¶ 73–75; tortious interference with a business relationship against Sheriff McGuire, Commissioner Spraggs, Fire Chief Brian Andrus, County Attorney Darnall, and "Unknown Defendants" (Count III), *id.* at ¶¶ 76–80; defamation against Sheriff McGuire, Commissioner Spraggs, Fire Chief Andrus, and "Unknown Defendants" (Count IV), *id.* at ¶¶ 81–83; intentional infliction of emotional distress against Sheriff McGuire, Commissioner Spraggs, Fire Chief Andrus, County Attorney Darnall, and "Unknown Defendants" (Count V), *id.* at ¶¶ 84–86; retaliation under "KRS 344" against Sheriff McGuire, Commissioner Spraggs, County Attorney Darnall, and "Unknown Defendants" (Count VI), *id.* at ¶¶ 87–89; invasion of privacy – false light against Sheriff McGuire, Commissioner Spraggs, Fire Chief Andrus, and "Unknown Defendants" (Count VII), *id.* at ¶¶ 90–93; Fourteenth Amendment violations under 42 U.S.C. §

1983 against Sheriff McGuire, Commissioner Spraggs, Fire Chief Andrus, County Attorney Darnall, and "Unknown Defendants" (Count VIII), *id.* at ¶¶ 94–98; KOSHA retaliation against Marshall County, County Attorney Darnall, and "Unknown Defendants" (Count IX), *id.* at ¶¶ 99–103; and "State Whistleblower KRS § 61.101, et seq." against Marshall County (Count X), *id.* at ¶¶ 104–07.

On November 20, 2023, Defendants Marshall County, Commissioner Spraggs, Sheriff McGuire, and County Attorney Darnall filed the instant Motion, seeking summary judgment on each of Freeman's claims against them. [R. 89]. Following a court-conducted settlement conference with Magistrate Judge Lanny King held December 19, 2023, Freeman settled his claims against Defendant Fire Chief Andrus. *See* [R. 95 (Report and Order)]; [R. 96]; [R. 106]. Unable to reach an amicable resolution with the remaining Defendants, Freeman responded in opposition to their Motion on January 4, 2024. [R. 98]. The Defendants replied [R. 100], and the matter now stands submitted for the Court's review.

## II.     STANDARD OF REVIEW

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining a motion for summary judgment, a court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates,* 578 F.3d 407, 414 (6th Cir. 2009). The court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986).

The initial burden of establishing no genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324. Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat that fact as undisputed. Fed. R. Civ. P. 56(e). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III.   ANALYSIS

### A.  ADA and KCRA Disability Discrimination against Marshall County for Hostile Work Environment (Count I)

Freeman's Third Amended Complaint alleges that Marshall County "created a hostile and discriminatory work environment based on Plaintiff's disabilities in violation of the American with Disabilities Act and KRS Chapter 344." [R. 56, ¶ 71]. The Defendants argue that "[w]ith the close of discovery, Freeman has failed to proffer any evidence upon which a reasonable jury could conclude he was subjected to unwanted harassment on the basis of his disability aside from his own conclusory statements" and "[h]is hostile work environment claims therefore fail as a matter of law." [R. 89, p. 13].

- 10 -

As a preliminary matter, "[d]isability-discrimination claims under the KCRA are analyzed in the same manner as disability-discrimination claims brought under federal law." *Land v. S. States Coop., Inc.*, 740 F. App'x 845, 848 (6th Cir. 2018) (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007)). "One way that a plaintiff may prove a violation of the KCRA is by showing that his employer's unlawful discrimination has created a hostile work environment." *Beatty v. Frito-Lay, Inc.*, 429 F. Supp. 3d 342, 347 (E.D. Ky. 2019). Under both the ADA and KCRA, to establish a hostile work environment claim,[2] Freeman "must show that: (1) []he has a disability; (2) []he was subjected to unwelcomed harassment; (3) the harassment was based on [his] disability; (4) the harassment created a hostile work environment; and (5) employer liability." *Johnson v. DeJoy*, No. 23-1813, 2024 WL 2874573, at *7 (6th Cir. June 7, 2024) (cleaned up) (citations omitted). With respect to the fourth element, unreasonable interference, "courts ask whether a reasonable person, in the totality of circumstances, would have perceived the conduct at

---

[2] The Court observes, here, that the law in the Sixth Circuit is unclear as to whether the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Freeman's hostile work environment claim. Under that framework, in a typical discrimination case where the plaintiff relies only on circumstantial evidence, "the employee has the initial burden of establishing his prima facie case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427, 433 (6th Cir. 2014). And though the Sixth Circuit has recently stated that this framework applies in hostile work environment cases, *see Johnson*, 2024 WL 2874573, at *7 (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007)) ("We follow the familiar *McDonnell Douglas* burden-shifting analysis when considering hostile-work-environment claims."); *Kubik v. Cent. Michigan Univ. Bd. of Trustees*, 717 F. App'x 577, 584 (6th Cir. 2017) ("Like discriminatory actions, hostile-work-environment claims based on indirect evidence are analyzed under a version of the *McDonnell Douglas* framework."), other Sixth Circuit cases outline the standard without mention of the *McDonnell Douglas* framework, and the Court could locate no case where the framework was actually applied. *See, e.g.*, *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (analyzing hostile work environment claim without mention of *McDonnell Douglas*); *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 484 (6th Cir. 2020) (same); *Burnette v. Wilkie*, No. 19-4015, 2020 WL 6121448, at *2 (6th Cir. Aug. 4, 2020) (noting generally that *McDonnell Douglas* applies to hostile work environment claims but only discussing four-prong test thereafter); *Stewart v. Esper*, 815 F. App'x 8, 20 (6th Cir. 2020) (discussing five-part test for proving hostile work environment without mention of *McDonnell Douglas*). In any case, whether *McDonnell Douglas* applies to Freeman's hostile work environment claim does not change the Court's analysis. Either way, he has not established all five elements of his hostile work environment claim; therefore, under the *McDonnell Douglas* burden shifting framework, he has not established his prima facie case. Further, to the extent the *McDonnell Douglas* framework applies, Freeman's claims fail at pretext for the same reasons outlined herein with respect to his retaliation claims. *See infra* Section III(B).

issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Mazur v. Wal-Mart Stores, Inc.*, 250 F. App'x 120, 128 (6th Cir. 2007) (internal citation and quotation marks omitted).

"Under this totality-of-circumstances test, the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (internal citations and quotation marks omitted). Indeed, "[i]n a hostile-work-environment claim, the actionable wrong is the environment, not the individual acts that, taken together, create the environment." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 708 (6th Cir. 2007) (internal citation and quotation marks omitted). Importantly, the environment must be both objectively and subjectively hostile. *Id.* at 707.

Here, the Defendants do not dispute that Freeman suffers from a disability due to his hearing loss and can therefore satisfy the first element of his hostile work environment claim. *See generally* [R. 89, pp. 13–17]. Notably, the Defendants even appear to concede the second element of Freeman's claim, as they acknowledge that there is "overwhelming evidence in the record to show that Freeman was criticized and 'harassed' for a variety of non-discriminatory reasons relating to his work performance and spending habits" and that the "these obstacles were subjectively difficult for Freeman to handle." [R. 89, p. 16]. Even so, the Defendants suggest Freeman's hostile work environment claim fails on the remaining elements, arguing the evidence presented at the close of discovery would not allow a reasonable jury to "conclude he was subjected to unwanted harassment on the basis of his disability aside from his own conclusory statements," that the harassment created an objectively hostile environment, or that the County can be held responsible for the criticism he faced. *Id.* at pp. 11, 15. The Defendants suggest that Freeman

- 12 -

simply faced "significant public disapproval and criticism" wholly unrelated to his disability. *Id.* at 14.

For his part, Freeman recites the elements of a hostile work environment claim but stops short of engaging with them. See [R. 98, pp. 14–15]. Rather, Freeman offers generally that he "suffered numerous instances of disability discrimination during his employment with" Marshall County. *Id.* at 15. The specific instances include the alleged comment by Commissioner Spraggs concerning an inability to hear in the radio room; the anonymous letter criticizing the County's decision to hire Freeman (which expressly referenced Freeman's hearing loss); the fact that, after Freeman returned to work following his first medical leave of absence in 2021, Deputy Judge Executive Warning "attempted to change [Freeman's] job duties several times" by "trying to make [him] cover shifts in the radio room and actually dispatch," which he could not do because of his cochlear implant; and the alleged "retroactive[] exhaustion [of his] vacation and sick leave" after taking two medical leaves. *See id.* at 15–16; [R. 79 (Freeman Deposition, Vol. 1), p. 71, subp. 278]. Freeman also asserts generally that, "[f]ollowing th[e] incident [with Commissioner Spraggs] and the anonymous letter, [his] employment was permeated with the discriminatory sentiment that Plaintiff could not perform his job," which "led to the petition of no confidence and to the numerous instances wherein Defendant Spraggs refused to allow Plaintiff to do his job in building the new 911 center." [R. 98, p. 15]. Freeman does not, however, elaborate on any specific instances where anyone expressed such "discriminatory sentiment."

As stated, the Defendants concede that Freeman can meet the first two elements of his hostile work environment claim. As to the third element (i.e., that the harassment was based on Freeman's disability), it is worth noting that the sole evidence of discriminatory animus with respect to Commissioner Spraggs's alleged comments is Freeman's own subjective perception of

them. Commissioner Spraggs testified that he was not aware of Freeman's hearing loss at the time of his alleged comments. *See* [R. 87 (Spraggs Deposition), p. 29, subpp. 108–09]; *see also Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) (explaining that an employer cannot discriminate based on a disability if it does not know of the disability). Moreover, testimony from Dispatcher Sheila Day, the only other witness to the alleged comments, supports Commissioner Spraggs's contention that he was not making any targeted, discriminatory remarks about Freeman's hearing, but simply commenting on how loud it was in the radio room. *See* [R. 84 (Day Deposition), p. 10].

The Sixth Circuit distinguished "harassment" and "discriminatory harassment" in *Trepka v. Board of Education*, 28 F. App'x 455 (6th Cir. 2002):

> Our harassment jurisprudence requires that we distinguish between harassment and discriminatory harassment. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000). Thus, an employee must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee's protected class. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). There is no evidence on the basis of which a reasonable jury could begin to determine that Terrell acted because of Trepka's disability rather than, for example, that Terrell asked Trepka to sit on the floor once because her developmentally disabled students needed extra attention, or that Terrell asked Trepka to knock the snow off her boots because Terrell did not notice anyone else, or that Terrell did not answer the panic button because she was not in her office, or that Terrell did all of these things because she just did not personally like Trepka. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (holding that harassment motivated by personal dislike for an employee is not actionable under the discrimination laws). To avoid summary judgment, Trepka need not prove Terrell's motivation, but she should at least provide some evidence of discrimination—and we can find none.

*Id.* at 461–62. Indeed, the Sixth Circuit has made clear that "[m]ere disrespect or antipathy will not be actionable under the statute unless a plaintiff can prove that such was motivated by discriminatory animus" and "[t]he conduct of jerks, bullies, and persecutors is simply not

actionable under Title VII[3] unless they are acting because of the victim's protected status." *Khalaf*, 973 F.3d at 484; *see also Handshoe v. Mercy Med. Ctr.*, 34 F. App'x 441, 449 (6th Cir. 2002) ("It is clear, from the record as a whole, that neither Lineberger or Funderburg got along with Handshoe. But there is no evidence that this was due to her disability. To the contrary, it appears that much of the 'harassment' she complains of was actually the result of her opposition to Lineberger's management decisions. . . . A reasonable jury could not infer . . . that the harassment Handshoe complains of was based on her disability, rather than on other potential factors—such as her performance, Lineberger's managerial style, or personal differences."); *Roseman v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, No. 20-2151, 2021 WL 4931959, at *3 (6th Cir. July 14, 2021) (explaining "harsh, rude, or offensive offhand comments, without more, cannot constitute severe harassment").

Moreover, the record is replete with evidence demonstrating that Freeman and Commissioner Spraggs (as well as the other Defendants) simply did not like or respect one another and could not work well together. But such "disrespect or antipathy will not be actionable under the statute unless" the Defendants were "acting because of [Freeman's] protected status." *Khalaf*, 973 F.3d at 484. On this record, no reasonable jury could find that they were. *See Norman v. Rolling Hills Hosp., LLC*, 820 F. Supp. 2d 814, 821–22 (M.D. Tenn. 2011) (finding "two specific examples of [supervisor's] rude behavior" were "too isolated to create a hostile work environment" and that testimony supervisor was "generally rude" were too vague and "not enough to support a hostile environment claim"); *see also Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 566

---

[3] Though Freeman's claims are brought under the under the KCRA and ADA, "[a] retaliation claim under the ADA uses the same framework as a retaliation claim under Title VII." *Welsh v. Automatic Data Processing, Inc.*, 954 F. Supp. 2d 670, 684 (S.D. Ohio 2013) (citing *Johnson v. Cleveland City Sch. Dist.*, 344 Fed. Appx. 104, 113 (6th Cir. 2009)).

(S.D.N.Y. 2022) (explaining that "excessive criticism and rudeness do not constitute a hostile work environment") (internal citation and quotation marks omitted).

Indeed, the evidence of the Defendants' strong disapproval of Freeman's fiscal responsibility and operation of the 911 center (whether it was justified or not) casts serious doubt on Freeman's contention that the "harassment" he endured was in any way related to his disability. The Defendants offer:

> Even prior to the time Freeman first stepped foot in the 911 Center on his first day, Freeman was met with opposition from the community and fiscally conservative leaders within the County. Although Freeman argues this opposition stems from discriminatory reasons, the record clearly shows that the public disapproval was a direct result of financial and operational considerations. For example, Commissioner Kevin Spraggs and countless others took issue with the nearly 60% increase in salary that Freeman had received compared to his predecessor – Freeman's predecessor, a woman, had been paid an annual salary of $48,000.00, while Freeman came into his employment with a starting salary of $80,000.00. And these frustrations (both from Commissioner Spraggs and the public, at large) were exacerbated months later when Freeman presented his first proposed 911 budget to the Fiscal Court, which nearly doubled the prior year's estimated operating costs. And to make matters worse in the public eye, Freeman asked the Fiscal Court to fund his extravagant budget by imposing a new $7 fee on all properties in the County.
>
> This frustration with Freeman's excessive spending habits set a negative tone for the entirety of his time in Marshall County. His extravagant funding requests were met with skepticism and disapproval by the Fiscal Court and the community.

[R. 89, pp. 2–3] (citing [R. 79 (Freeman Deposition), pp. 93, 88–89, 137–38]) (cleaned up). And unlike Freeman's subjective beliefs about the Defendants' motives, there is actual evidence in the record to support the Defendants' position that their actions were motivated by disagreements over policy, use of taxpayer funds, and the operation of the 911 center.

To be sure, Freeman's attempts to rebut the Defendants' evidence on motive fall short. Freeman suggests the Defendants' claims that their conflict stemmed from disagreements over spending is belied by the fact that, "despite claims that Plaintiff engaged in exorbitant spending,

the budget was approved by the Fiscal Court." [R. 98, p. 9]. That some of the Fiscal Court members were outvoted and Freeman's budget was ultimately approved does not, however, indicate that their concerns over Freeman's fiscal responsibility were motivated by disability discrimination. Likewise, many of Freeman's other arguments serve only to confirm the Defendants' position that their motivations were rooted in disagreements over spending and operation of the 911 facility, and not Freeman's disability. *See, e.g.*, *id.* at 30 ("Defendants actively tried to prevent Plaintiff from performing his job and making improvements. Defendant Spraggs *attempted to lock down spending* on the 911 center, an essential function of Plaintiff's job. Additionally, Defendant McGuire actively complained that it was Plaintiff's fault that the radios were not fixed while taking no active steps to fix his how radios himself. It is abundantly clear that no other County employee was treated similarly to Plaintiff. This includes *significant scrutiny of their budget*, which no other department had to endure.") (cleaned up) (emphasis added). Though Freeman maintains that, "in reviewing the record, it is clear that Defendants' actions were motivated due to his ongoing complaints of discrimination and retaliation," *id.* at 29, he offers no evidentiary support that would allow a reasonable jury to reach that conclusion.

Of course, it is without doubt that many members of the public and county employees, including Commissioner Spraggs, clearly disliked or had "antipathy" toward Freeman, but this record reflects those feelings were rooted in non-discriminatory reasons. With respect to Commissioner Spraggs in particular, the evidence shows that his feelings predated the alleged comments in the radio room and clearly began around the time of Freeman's hire, which Commissioner Spraggs voted against because of his steep salary increase from the previous 911 Director. *See* [R. 87 (Spraggs Deposition), p. 8, subp. 25]. Put simply, the record evidence fails to

establish harassment based on disability, and Freeman has therefore failed to establish the third and prong of his hostile work environment claim.

However, even assuming he can meet the third element (i.e., that the alleged discrimination was based on his disability), Freeman's hostile work environment claim fails on the fourth element (i.e., that the alleged harassment created a hostile work environment). When evaluating this fourth factor, the Court considers "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Wargo v. MJR Partridge Creek Digital Cinema 14*, No. 22-12063, 2024 WL 710613, at *6 (E.D. Mich. Feb. 21, 2024) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[C]ourts must determine whether the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment," and "[f]ailure to establish" such conditions "is grounds to grant a defendant summary judgment." *Id.* (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)) (add'l citations omitted) (cleaned up). The alleged harassment "'must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.'" *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)).

In his response brief, as noted above, Freeman cites to a handful of specific examples of alleged discriminatory conduct: Commissioner Spraggs's August 2019 comment about his own inability to hear the radio room; the anonymous letter criticizing the County's decision to hire Freeman; Deputy Judge Executive Warning's attempts to make Freeman cover shifts in the radio

room, even though his cochlear implant made that work impossible; the changes to his vacation and sick leave; the petition of no confidence; and "numerous instances wherein Defendant Spraggs refused to allow Plaintiff to do his job in building the new 911 center." [R. 98, pp. 14–16].

As an initial matter, the Court notes that nothing in the record indicates the anonymous letter was authored or instigated by any of the defendants or anyone associated with them, or that the County "either knew or should have known about [] harassment and failed to take corrective measures," *Hamilton*, 2024 WL 874781, at *6, based on its receipt of a single, anonymous letter criticizing its decision to hire Freeman because of his hearing loss. *See Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 396 (W.D. Va. 2023) (explaining "an employer may be liable for a hostile work environment created by anonymous third parties 'if it knew or should have known about the harassment and failed to take effective action to stop it by responding with remedial action reasonably calculated to end the harassment'" but finding that where employee only received one anonymous, discriminatory letter the employer "was effective at preventing [the plaintiff] from receiving racist letters at the office"). Thus, no reasonable jury could impute liability onto Freeman's employer for the discriminatory animus contained in the letter. The Court therefore turns to the remaining alleged incidents of discriminatory conduct.

The Court first considers Commissioner Spraggs's allegedly targeted, discriminatory comments about Freeman's hearing loss during his visit to the 911 center. *See* [R. 98, p. 15]. The Sixth Circuit has determined similar conduct "falls well short of even presenting a genuine issue of material fact regarding whether [the plaintiff] was subjected to a hostile work environment." *Trepka*, 28 F. App'x at 461. In *Trepka*, for example, the plaintiff-teacher suffered permanent back and neck injuries in a car accident that "prevent[ed] her from climbing stairs 'quickly' and carrying

'oversized' loads." *Id.* at 458. She sued the Cleveland City School Board for disability-based discrimination claiming, in part, that she was subjected to a hostile work environment where the school's principal "had a relatively contentious oral confrontation with Trepka, yelling: 'Answer me, Mrs. Trepka. Answer me. You can walk. We all see you walk. You walk these steps every day,'" the principal "asked Trepka to knock the snow off her boots before entering the building," "asked Trepka and another allegedly 'disabled' teacher to sit on the floor with their classes while other teachers were not so asked," and "failed expeditiously to respond" when the plaintiff-teacher pressed a panic button in her classroom. *Id.* at 461. The Sixth Circuit described the school principal's "stern words about Trepka's ability to walk" as "the strongest instance of [allegedly discriminatory] conduct." *Id.* "At most, however," the Sixth Circuit reasoned that "those words express skepticism regarding Trepka's condition" and "[t]his single incident of explicit reference to Trepka's disability is not sufficiently severe to constitute harassment under our precedents." *Id.*

Turning next to Deputy Judge Executive Warning's comments, Freeman testified that when Deputy Judge Executive Warning tried "to make [him] cover shifts in the 911 center, and [Freeman] knew [he] couldn't do that," he spoke with Judge Executive Neal about it, who, according to Freeman, said, "okay, no problem, you know, I get it." [R. 79 (Freeman Deposition, Vol. 1), p. 72, subp. 284]. Freeman also acknowledged that Deputy Judge Executive Warning did not have the authority to fire him, and that after discussing the situation with Judge Executive Neal, "that was that." *Id.* Freeman was not disciplined for refusing to perform dispatching duties, and he and Deputy Judge Executive Warning even "came up with a plan to get some folks cross-trained who could step into [the dispatching] role." *Id.* at subp. 285. And though Freeman testified that the *requests* persisted whenever there was "a vacated shift," because no one was actually hired as

discussed, again, there is no evidence that Freeman was *required* to actually dispatch or suffered any consequences for declining Deputy Judge Executive Warning's requests.

Nor is there evidence that Deputy Judge Executive Warning's requests were "physically threatening or humiliating," or "unreasonably interfered" with Freeman's other work, *Wargo*, 2024 WL 710613, at *6. Rather, Freeman simply felt that the requests "put [him] into a situation where it was a no win." [R. 79 (Freeman Deposition, Vol. 1), p. 72, subp. 285]. The requests were not, however, objectively hostile. *See Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998) (affirming district court's finding that plaintiff "failed to establish any facts . . . severe enough to create an objectively hostile work environment" where plaintiff claims he "was harassed by others in the department because of his disability and his disability-related absences" and noting work-related "[c]onversations . . . do[] not constitute harassment simply because they cause the employee distress").

Freeman also references, albeit briefly, his employer's attempts to exhaust his sick leave and vacation time and his termination. *See* [R. 98, p. 16]. The Court discusses the issues relating to Freeman's leave time below in the context of his retaliation claims. *See infra* Section III(B). As explained in that section, the record demonstrates that, at most, there was an *attempt* to make changes to Freeman's leave time, and no reasonable jury could find a causal link between that attempt and a discriminatory animus. *See infra* Section III(B). The Court also discusses Freeman's alleged termination below and concludes that the evidence of record indicates that Freeman quit.[4] *See infra* Section III(B). For the same reasons, his leave time issues and the loss of his job do not support his disability discrimination claims.

---

[4] Freeman does not argue that he was forced to quit or was constructively discharged.

Lastly, Freeman argues that his "employment was permeated with the discriminatory sentiment that [he] could not perform his job" which "led to the petition of no confidence and to the numerous instances wherein Defendant Spraggs refused to allow Plaintiff to do his job in building the 911 center." [R. 98, p. 15]. However, there is no discriminatory sentiment on the face of the petition, which instead cites numerous performance-related reasons for its execution, *see* [R. 85-8 (Petition)], nor does Freeman cite to any specific instances of "discriminatory sentiment." And Freeman offers no evidence (other than his subjective belief) that would allow a reasonable jury to find that the petition was executed for any reason related to his disability. *See generally id.* at 2. The same is true of his reference to "numerous instances" involving Defendant Spraggs "refus[ing] to allow Plaintiff to do his job in building the 911 center." [R. 98, p. 15]. Plaintiff does not even attempt to discuss any such instances involving Defendant Spraggs.

Considering all of the alleged incidents of harassment outlined above, the Court finds that, based on the totality of these circumstances and considered together, a reasonable jury could not find that these isolated incidents—many of which are simply not connected to Freeman's disability and therefore fail at the third element—constitute a hostile work environment. Stated another way, based on the record before this Court, a reasonable jury could not find that Freeman's workplace was so "permeated with discriminatory intimidation, ridicule and insult . . . sufficiently severe or pervasive [enough] to alter the conditions of [his] employment and create an abusive work environment." *Wargo*, 2024 WL 710613, at *6. Thus, his disability discrimination claims based on a hostile work environment fail at the fourth element.

For all these reasons, Freeman has not made a sufficient showing of the necessary elements of his hostile work environment claim. Construing the evidence in the light most favorable to Freeman, and drawing all reasonable inferences in his favor, *Matsushita*, 475 U.S. at 587; *Lindsay*,

578 F.3d at 414, no reasonable jury could find that he was subjected to a hostile work environment based on his disability. Summary judgment in favor of the Defendants is therefore appropriate on Freeman's disability discrimination (hostile work environment) claim (Count 1).

**B.  KCRA, ADA, and Title VII Retaliation Claims (Counts II and VI)**

Free also brings three retaliation claims. *See* [R. 56, ¶¶ 73–75 (Count II, Retaliation under Title VII, KCRA, and ADA against Marshall County); ¶¶ 87–89 (Count VI, Retaliation under the KCRA against certain individual defendants); ¶¶ 99–103 (Count IX, Retaliation under KOSHA against Marshall County and certain individual defendants)].  The Court considers two of those retaliation claims here and addresses the third below. *See infra* Section III(D).

First, in Count II, Freeman alleges that Defendant Marshall County "took numerous retaliatory acts against [him], culminating in [his] ultimate termination" after he "complained of the illegal hostile work environment regarding both disability discrimination and sexual harassment," in violation Title VII, the KCRA, and the ADA. *See* [R. 56, ¶ 74]. Similarly, in Count VI, Freeman alleges that Defendants McGuire, Spraggs, Darnall, and Unknown Defendants "took numerous retaliatory acts against Plaintiff, culminating in Plaintiff's ultimate termination" after he "complained of the illegal hostile work environment regarding both," in violation of the KCRA. *Id.* ¶ 88.

Just as federal and state discrimination claims are analyzed under the same standards, so too are federal and state retaliation claims. Indeed, "retaliation claims under the KCRA are evaluated under the same standard as this court uses to evaluate federal Title VII claims," *Land*, 740 F. App'x at 848 (citing *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014)), and, in the same way, "[c]laims for retaliation under the KCRA are analyzed under the same standards as claims for retaliation under the ADA." *Clemons v. Hillshire Brands Co.*, No.

2:21-CV-016 (WOB-EBA), 2023 WL 3935021, at *17 (E.D. Ky. June 9, 2023), aff'd, No. 23-5622, 2024 WL 3355379 (6th Cir. Apr. 11, 2024) (citations omitted). Moreover, the same framework applies for retaliation claims "'whether brought under the ADA or Title VII.'" *O'Donnell v. Univ. Hosps. Health Sys.*, No. 1:16-CV-2480, 2018 WL 1627436, at *11 (N.D. Ohio Apr. 4, 2018), *aff'd sub nom. O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605 (6th Cir. 2020) (quoting *Barrett v. Lucent Techs., Inc.*, 36 Fed. Appx. 835, 840 (6th Cir.2002). Consequently, courts often analyze retaliation claims together, whether brought under federal or state law. *See, e.g.*, *Reeder v. Cnty. of Wayne*, 177 F. Supp. 3d 1059, 1081 (E.D. Mich. 2016) (citing *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997)) ("The Court will analyze Plaintiff's disability and racial retaliation claims together, because '[r]etaliation claims are treated the same whether brought under the ADA or Title VII.'").   Accordingly, the Court considers Freeman's Count II and Count IV together.

"In cases where," as here, "a plaintiff relies on circumstantial evidence of retaliation, the *McDonnell Douglas* burden shifting framework applies." *O'Donnell*, 2018 WL 1627436, at *11 (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014)). Under that framework, Freeman must first make out a prima facie case of retaliation. *Montell*, 757 F.3d at 504. If he does so, "the burden shifts to [the Defendants] to produce a legitimate, non-retaliatory reason for [their] action." *Id.* "Assuming that [the Defendants are] able to produce such an explanation, the burden shifts back to [Freeman] to put forward competent evidence from which a reasonable jury could conclude that the stated reason is merely pretextual." *Id.*

To establish a prima facie case of retaliation, Freeman must show that he (1) engaged in protected activity, (2) his employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against Freeman, and (4) there was a causal connection

between the protected activity and the adverse employment action. *Land*, 740 F. App'x at 850 (citing *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009)). Importantly, "Title VII does not protect an employee if his opposition is merely a 'vague charge of discrimination.'" *Id.* (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)); *see also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 592 (6th Cir. 2007) (finding that plaintiff's vague charge that management was "out to get him" was insufficient to indicate unlawful employment practice).

Turning to the first element—a protected activity—the Court notes that Freeman's complaint and his response brief reference only the following as allegedly protected activities: his August 19, 2019 complaint of disability discrimination, related to Commissioner Spraggs's comments about a hearing standard at the 911 center, and the February 2020 complaint of sexual harassment, made by another employee but forwarded to the appropriate personnel by Freeman. *See* [R. 56, ¶¶ 74, 88; R. 98, pp. 16–22].[5] The Defendants do not dispute that the former—the

---

[5] In the factual background section of his Third Amended Complaint, Freeman references other potentially protected activities. [R. 56, ¶¶ 53, 63]. However, in the allegations pertaining to Counts II and IV, Freeman does *not* reference those activities. *See id.* ¶¶ 73–74, 87–89. Indeed, many of the alleged retaliatory events took place *prior* to those events. Perhaps more importantly, in his response brief, Freeman does not rely on those protected activities when discussing his retaliation claims, and instead discusses *only* the 2019 disability discrimination complaint and the 2020 sexual harassment complaint. True, he refences making other complaints of discrimination in his response brief when discussing the factual background, [R. 98, pp. 6–7], but he makes no effort to engage with those complaints when discussing his retaliation claims, nor does he attempt to tie them to an adverse employment action. To the extent Freeman ever intended to bring a retaliation claim based on such protected activities, he has wholly failed to articulate, much less develop those claims, and the Court considers them to have been abandoned.

Similarly, though Freeman's Third Amended Complaint also states in the factual background section that "in obvious retaliation . . . for requesting FMLA Leave, Plaintiff was terminated by Defendant County," *id.* ¶ 63, he does not actually bring an FMLA retaliation claim, and, again, in the allegations pertaining specifically to Counts II and IV, Freeman does *not* reference his medical leave at all. *See id.* ¶¶ 73–74, 87–89. And nowhere in either parties' briefing is the alleged FMLA retaliation further discussed, beyond Freeman's bare references in his response to his November 2022 medical leave. [R. 98, p. 17]. But Freeman references his medical leave when discussing adverse employment actions (not protected activities), and moreover, he has otherwise completely failed to develop, or even articulate, a retaliation claim based on that potentially protected activity. The Court therefore treats such a claim—to the extent it was ever asserted—as abandoned.

August 19, 2019 disability discrimination complaint—is a protected activity. [R. 89, pp. 18, 20].

And while the Defendants *do* dispute that the February 2020 sexual harassment complaint is a

protected activity, the Court need not reach that discrete issue (which was not thoroughly briefed

by the parties),[6] as Freeman's retaliation claims fail for other reasons discussed below.

As for the second element—that the employer knew of the protected activities—

Defendants do not dispute that this element is satisfied with respect to either complaint. [R. 89,

pp. 15–20].

With respect to the third element, Freeman cites to the following as adverse employment

actions.[7] First, with respect to the August 19, 2019 disability discrimination letter, Freeman argues

that, after he filed the complaint, Spraggs "lashed out at [Freeman] and refused to apologize,"

"made it his mission to lock up spending on the 911 facility," conspired to have Freeman removed

from his position and "supported a board to do just that," and stopped communicating with

---

Moreover, to the extent that Freeman relies on these various potential protected activities, his retaliation claims still fail for the other reasons set forth herein (e.g., failure to identify an adverse employment action).

[6] The Defendants dispute that Freeman engaged in a protected activity when he forwarded the sexual harassment complaint via email because he did not substantively participate in the complaint. *See* [R. 89, p. 22] (arguing Freeman's Title VII "retaliation claim also fails for a far more fundamental reason – Freeman did not engage in a protected activity"). In response, Freeman notes that "[t]he Equal Employment Opportunity Commission ('EEOC') states that it is illegal to retaliate against employees for "communicating with a supervisor or manager about employment discrimination or harassment" and that he "certainly communicated to his superiors about employment discrimination or harassment." [R. 98, pp. 21–22]. Neither party cites any case law on this discrete issue, however, and the Court need not resolve their dispute. Whether or not Freeman engaged in a protected activity when he relayed the sexual harassment complaint, his retaliation claim would still fail for the reasons discussed herein.

[7] When discussing alleged adverse employment actions, Freeman also briefly alleges that "Defendant County failed to protect Plaintiff or even investigate his complaints of harassment and discrimination." [R. 98, p. 18]. Freeman does not discuss or engage with this argument further, and the Court considers this argument waived. Moreover, Freeman does not cite to any evidence of record to support this allegation. The only evidence cited in support of this theory addresses only his direct supervisor's response to his August 2019 discrimination complaint, but the cited portions of the supervisor's deposition indicate that he *did*, in fact, take steps to ensure no further discrimination. *See* [R. 81, p. 25, subpp. 96–99 (Neal Deposition)]; *see also Bunt v. Clarksville Montgomery County School System*, 23-6020, 2024 WL 3458752, *4 (6th Cir. 2024) (acknowledging that "a failure to investigate a claim of retaliation can amount to an adverse employment action" but noting that the plaintiff had failed to establish that the defendant failed to investigate her claims (citation omitted)).

Freeman. [R. 98, pp. 18–19]. Next, with respect to the February 2020 sexual harassment complaint, Freeman argues that his relationship with McGuire deteriorated. *Id.* at 20. For example, Freeman argues that McGuire put a black trash bag on the dispatch door, which prevented employees from accessing certain areas of the building; removed the sexual harassment victim from her shift and interrogated her; "conspired to bring the radio issue to the media, to stop the building of the regional 911 facility, and to remove Mr. Freeman"; helped to draft the no confidence petition and "tricked several individuals into signing the petition"; and stated that "if he took office, he would take care of the leadership problem in 911 by terminating Mr. Freeman." *Id.* at 20–22. He also mentions in his response brief that McGuire told Freeman "that his people hate Plaintiff's people." *Id.* at 3. Freeman also suggests that the County "took away Plaintiff's vacation and sick leave time despite [his] objections and him being on medical leave," and the County "failed to protect Plaintiff or even investigate his complaints of harassment and discrimination," though he does not discuss those events in detail nor attempt to tie them to either complaint. *Id.* at 18.

    None of these are adverse employment actions. "An adverse employment action is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (internal citation and quotation marks omitted).[8]

    First, regarding Commissioner Spraggs's lack of communication with Freeman and Sheriff McGuire's comments (e.g., that "his people hate Plaintiff's people") and his placing a trash bag

---

[8] To the extent Freeman relies on these various instances in an attempt to argue that the defendants created a hostile work environment in retaliation for filing the August 19, 2019 disability discrimination complaint and/or the February 2020 sexual harassment complaint, he has wholly failed to develop that argument. Moreover, as the Court has already explained, Freeman has failed to demonstrate an objectively hostile work environment, or a genuine issue of material fact on that issue. *See supra* Section III(A).

over the door of a shared space, "petty slights, minor annoyances, and simple lack of good manners do not qualify as adverse action." *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 826 (E.D. Mich. 2009) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Similarly, though the petition of no confidence sharply criticized Freeman's performance as 911 Director, it had no impact on Freeman's job, responsibilities, or benefits, as he continued to serve as the 911 Director for more than a year after its execution. *See Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 216–17 (E.D.N.Y. 2014) ("Excessive scrutiny, monitoring, and criticisms of [plaintiff's] job performance [are] not adverse employment actions absent evidence of materially adverse impact.") (citation omitted); *Lester v. Natsios*, 290 F. Supp. 2d 11, 30 (D.D.C. 2003) ("Criticism of an employee's performance unaccompanied by a change in position or status does not constitute adverse employment action.") (citation omitted).

Likewise, though Freeman contends the County "took away [his] vacation and sick leave," Freeman's own evidence reveals that, after Deputy Judge Executive Warning *attempted* to retroactively exhaust Freeman's vacation and sick time after Freeman's first medical leave, Judge Executive Neal "reminded Mr. Warning that all Directors can use their comp time how they want in regard to earned time and had him change [Freeman's] time back to the employee request of use." [R. 98-1 (Affidavit of Kevin Neal), p. 7]. This *attempt* to change Freeman's benefits is therefore not an adverse employment action. *See Wondrak v. Cleveland Metro. Sch. Dist.*, No. 1:18-CV-1977, 2022 WL 280433, at *6 (N.D. Ohio Jan. 31, 2022), appeal dismissed, No. 22-3299, 2022 WL 2897011 (6th Cir. June 2, 2022) (citing *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)) ("Plaintiff was threatened with loss of sick time benefits and with non-renewal of his contract, but neither came to fruition. A threat to discharge is not an adverse employment action."). Moreover, on this issue, the Defendants submit that Deputy Judge Warning's process of handling

Freeman's medical leave was "a matter of County policy," which typically requires employees taking medical leave to use unpaid FMLA leave instead of compensatory time. [R. 100, p. 6]. The Defendants further suggest that any agreement between Judge Executive Neal and Freeman concerning a deviation from the typical leave policy was "not communicate[d] to his staff," so Deputy Judge Warning was unaware that he should process Freeman's leave differently. *Id.* at 6 n.4. On this evidence, even if it found that Freeman somehow suffered an adverse employment action via a loss of compensatory time, no reasonable jury could find that it was causally linked to discriminatory animus.

Next, concerning Commissioner Spraggs's alleged attempt to "lock[] up spending on the 911 center," [R, 98, p. 18], the Defendants correctly note that Commissioner Spraggs's "voting history as it related to 911 expenditures," [R. 100, p. 7], is not an adverse employment action against Freeman, nor does it evidence discriminatory animus. As discussed, Commissioner Spraggs's personal convictions concerning the County's use of taxpayer funds long preceded Freeman's tenure as 911 Director, *see* [R. 87 (Spraggs Deposition), p. 8, subp. 25], and there is no evidence to support Freeman's theory that Commissioner Spraggs's disapproval of various funding proposals was in any way retaliatory against Freeman himself. Lastly, the Court cannot even perceive how the Sheriff's Department's investigation into sexual harassment allegations, which would logically involve an interview of the alleged *victim*, could in any way constitute an adverse employment action against *Freeman*. Indeed, interviewing the alleged victim would seem to be the logical response to, and not retaliation for, Freeman's report of a sexual harassment complaint.

The only other adverse employment action Freeman points to is his alleged termination during his second medical leave of absence. [R. 98, p. 18]. Of course, "irrefutable is the fact that the termination of [a plaintiff's] employment [is] an adverse employment action." *Kuhn v.*

*Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013). As previously stated, however, the parties disagree over whether Freeman was actually terminated. *See* [R. 89, pp. 18–19]; [R. 98, pp. 17–18]. And the Court agrees with the Defendants that, on this record, there is significant evidence indicating that Freeman quit, and little to support Freeman's claim that he was fired.

On or around November 22, 2022, Freeman rented a U-Haul trailer and cleaned out his work office, including approximately 2,500 books, turned in his keys to the 911 Center and his county-issued vehicle, and never returned to work. [R. 79 (Freeman Deposition, Vol. 1), p. 276–278]. Around that time, Freeman also sold his home in Marshall County and moved to London, Kentucky. *Id.* Freeman filed for disability retirement in November 2022 and later filed for unemployment benefits in January 2023. *See* [R. 49-1 (Kentucky Public Pension Authority Form)]; [R. 49-2 (Notice of Unemployment Insurance Claim)]. In the face of the significant evidence supporting the County's belief that Freeman has abandoned his post, Freeman simply offers, "as a clear indication that Plaintiff had not quit his employment, in 2023, Plaintiff sent an email to Deputy Judge Pagel in 2023 extending his medical leave to April 15, 2023, and received no response. . . . It would seem strange to request additional medical leave if you have already quit." [R. 98, p. 11]. But this alleged email, sent at some unspecified point in 2023, does little to rebut the Defendants' position that the County reasonably believed Freeman had quit based on his actions prior to sending this email.

Indeed, it appears that, in late November 2022, Freeman filed for disability retirement, and in January 2023, he filed for unemployment. *See* [R. 49-1 (Kentucky Public Pension Authority Form)]; [R. 49-2 (Notice of Unemployment Insurance Claim)]. The Notice of Unemployment Insurance Claim, sent to the County, states that the claimant (Freeman) "has indicated they worked for you from 05/0/2019 through 11/23/2022 and is filing the claim due to Discharge." [R. 49-2].

Yet, he does not argue that he was terminated in November 2022, and instead claims he did not learn of his alleged termination until March 9, 2023, and he believed he was employed with the County through that time. [R. 79, p. 73, subp. 286:13–22 (Freeman Deposition)].

But even assuming he was terminated, Freeman has not causally connected his alleged termination with either of the protected activities he points to (filing a disability discrimination claim in 2019 and relaying a sexual harassment complaint in 2020). According to Freeman, he was terminated on or around March 9, 2023. [R. 79 (Freeman Deposition, Vol. 1), p. 80, subp. 316]. His disability discrimination complaint related to the Spraggs incident was filed more than three years prior, on August 19, 2019. *See id.* at pp. 100–101; [R. 98, pp. 18, 2]. By Freeman's own account, he relayed the sexual harassment complaint "in or around February 2020," [R. 98, p. 20], almost exactly three years before his alleged termination. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 650 (6th Cir. 2015) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). "But where some time elapses between the employee's protected activity and the adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (internal citation and quotation marks omitted). Indeed, "temporal proximity by itself rarely will establish sufficient evidence to create a triable issue of fact over causation" and "[e]ven in the rare case where it does suffice, the gap in time between the protected activity and the alleged retaliation must be brief." *Lahar v. Oakland Cnty.*, 304 F. App'x 354, 359 (6th Cir. 2008) (citing *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir.2002) (collecting cases)).

The gap of more than three years between Freeman's protected activities and his alleged termination, without other evidence of discriminatory motive, is insufficient to causally connect the protected activities with the termination. *See Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 344 (6th Cir. 2001) (affirming district court's determination that plaintiff "failed to raise a genuine issue of material fact as to whether there is a causal connection between her protected activity and her lateral transfer" three years later because such "a significant gap in time between the protected activity and the adverse action cannot give rise to an inference of a retaliatory motive"); *Paige v. BAE Sys. Tech. Sols. & Servs., Inc.*, No. 2:09-CV-11657, 2016 WL 4592177, at *5 (E.D. Mich. Mar. 22, 2016) ("Three years is too attenuated a period of time to show a causal connection between an alleged protected activity and an adverse employment action, even when combined with the handful of [] other supposed retaliatory acts."); *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 289 (6th Cir. 2012) (holding that gap of more than a year between protected activity and termination "does not raise the inference that the protected activity was the likely reason for the adverse action").

Because Freeman has failed to produce any evidence that would allow a reasonable jury to find that he suffered an adverse employment action causally connected to either his disability discrimination complaint or his involvement in relaying the sexual harassment complaint, he cannot satisfy his prima facie case for that claim. But even if Freeman had met his initial burden of demonstrating a prima facie case of retaliation, the Defendants have again pointed to legitimate, non-discriminatory reasons for their actions.

"A legitimate, non-discriminatory reason is one 'which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Bowie*, 72 F. App'x at 263 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507

(1993)). In addition to their general concerns with Freeman's spending, the Defendants also offer more specific explanations for certain actions. For example, they explain that Sheriff McGuire placed the black trash bag over door between the sheriff's office and the 911 center in the height of the COVID-19 pandemic in an effort "[t]o stop the spread of coronavirus" by "keep[ing] [the] two offices separate." [R. 86 (McGuire Deposition), p. 13, subp. 44]. Additionally, the evidence shows that Sheriff McGuire's placement of the trash bag came only after Freeman sent out an email requesting that people refrain from entering the dispatching center in the height of the COVID-19 pandemic. [R. 79 (Freeman Deposition, Vol. 1), p. 45, subp. 174]. With respect to Deputy Judge Warning's attempt to require that Freeman use unpaid FMLA leave rather than compensatory time during his medical leave, the Defendants offer that this was a matter of "County policy," and that Deputy Judge Warning was unaware of any agreement between Judge Executive Neal and Freeman to deviate from this policy. [R. 100, pp. 5–6].

The Defendants also note more generally that "the driving force behind each criticism of and opposition to Freeman can be easily attributed to one of the six reasons neatly outlined in the First Responders' petition of no confidence," [R. 89, p. 31], which included: "[a] dangerously unreliable radio communications network," "[d]evastated working relationship" with other agencies, "[l]imited to no discussions with agency heads regarding communications infrastructure and department needs," "[c]ommandeering radio systems without discussion from agencies involved," "exorbitant spending on unnecessary projects despite the desperate need for safe radio communications," and because "[e]mergency responders fe[lt] the attitude and performance of Marshall County E911 [was] at an all-time low which jeopardizes responder safety." [R. 85-8 (Petition)].

As for the end of Freeman's employment with the County, the Defendants submit that Freeman was not fired, but that "the County believed that Freeman had quit" and proceeded accordingly. [R. 89, p. 19]. They explain that "[t]he last day Freeman worked for Marshall County was November 22, 2022," at which time "he cleaned out his work office," including approximately 2,500 books, "turned in his keys to both the 911 Center and his county vehicle, and never returned," and he "even sold his home in Marshall County days prior to abandoning his job and, since that time, has resided approximately 265 miles away in London, Kentucky." *Id.* at 18 (citing [R. 79 (Freeman Deposition, Vol. 1), pp. 276–278]). When deposed, Judge Executive Neal testified that though he believed Freeman planned to return to work after his second medical leave, Freeman never indicated when exactly he planned to do so. *See* [R. 81 (Neal Deposition, Vol. 1), pp. 35–37, subpp. 139–146].

The Defendants further note that "Freeman filed for disability retirement in November 2022 and later filed for unemployment benefits in January 2023."[9] *Id.* (citing [R. 49-1 (Kentucky Public Pension Authority Form)]; [R. 49-2 (Notice of Unemployment Insurance Claim)]). They also point out that the County was still paying Freeman's fringe benefits through the time he sought unemployment. *Id.* The Defendants therefore suggest that "the unemployment filing coupled with Freeman's aforementioned behavior" led the County to believe he had quit. *Id.* at 19. All of these reasons, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of" the County proceeding as if Freeman no longer worked as its 911 Director, and are "sufficient to shift the burden back to [Freeman] to demonstrate pretext." *Bowie*, 72 F. App'x at 263.

---

[9] Again, it is worth noting that Freeman testified that he believed he was employed with the County *through March 9, 2023*, when he was told via text message that the County had sent out an email stating that Freeman was no longer employed. [R. 79, p. 73, subp. 286: 13–22 (Freeman Deposition)].

Again, "[o]nce an employer provides a legitimate, nondiscriminatory reason for its actions, the employee must show that the stated reason is merely a pretext for discrimination." *Banks*, 15 F. Supp. 3d at 694–95 (internal citation and quotation marks omitted). As stated above, "[a] plaintiff can show pretext by demonstrating that the proffered reasons: (1) had no basis in fact, (2) 'did not actually motivate the company's decision' or (3) were insufficient to support defendants' actions." *Id.* (quoting *Cline v. BWXT Y–12, LLC*, 521 F.3d 507, 509 (6th Cir. 2008)). Importantly, "[t]o show that the proposed reason was merely pretext, the plaintiff must provide more than mere speculation." *Id.* (citing *Hagan v. Warner/Elektra/Atl. Corp.*, 92 Fed. Appx. 264, 268 (6th Cir. 2004)). A plaintiff's "subjective belief that [the defendant's] proffered reason is false, and that retaliation was the actual motive, is not sufficient to withstand summary judgment." *Carson v. Ford Motor Co.*, 413 Fed. Appx. 820, 824 (6th Cir. 2011) (citation omitted).

Again, in response to the Defendants' proffered reasons for their actions, Freeman offers only his subjective speculation that they are pretextual. He submits that his "work performance was not the real reason for the retaliation and treatment, as evidenced by the fact that despite the radio issue being a longstanding problem that significantly predated Plaintiff's employment, no other 911 director or member of the Fiscal Court has had a petition of no confidence circulated about them." [R. 98, p. 30]. But the Sixth Circuit has explained that a plaintiff's "subjective skepticism regarding the truth of" a defendant's proffered reason "does not alone raise a triable issue as to pretext." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 768 (6th Cir. 2015) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004)) (add'l citation omitted); see also *Carson*, 413 Fed. Appx. at 824 (explaining that speculation does not constitute evidence that the Defendants' proffered reasons are "false, and that retaliation was the actual motive" for their actions). To be sure, even if the radio issues existed before Freeman's tenure as 911 director, the

Defendants could still have looked to him to fix them and been frustrated by his perceived failure in remedying them. The Defendants have provided several legitimate, non-discriminatory reasons for their actions, and though Freeman has perhaps cast doubt on some of them, he has failed to rebut all of them with supportive evidence. *See Aday v. Westfield Ins. Co.*, No. 21-3115, 2022 WL 203327, at *12 (6th Cir. Jan. 24, 2022) (finding that even where "Plaintiff has cast doubt on some—but not all—of the reasons Defendants articulated for" their actions, "Plaintiff has not created a genuine dispute under the general pretext test"). Without any actual evidence to show pretext, no reasonable jury could find that the legitimate, non-discriminatory reasons Defendants offered to justify their actions were "false, and that discrimination was the real reason" behind them. *Seeger*, 681 F.3d at 285 (citation omitted).

Because Freeman has not made a prima facie showing of retaliation, and because even if he had, the Defendants have offered legitimate, non-discriminatory reasons for their actions that Freeman has not shown are pretextual, the Defendants' motion for summary judgment will be granted as to Freeman's KCRA, ADA, and Title VII retaliation claims (Counts II and IV).

### C. Equal Protection (Fourteenth Amendment) violations under 42 U.S.C. § 1983 against Sheriff McGuire, Commissioner Spraggs, County Attorney Darnall, and "Unknown Defendants" (Count VIII)

Next, Freeman alleges he was treated differently because of his disability in violation of the Equal Protection Clause of the Fourteenth Amendment. [R. 56 (Third Amended Complaint), ¶¶ 94–98]. The Defendants submit that Freeman's Equal Protection claims fail because Freeman has failed to demonstrate a constitutional violation by Sheriff McGuire, Commissioner Spraggs, or County Attorney Darnall in their individual capacities, and even if he had, those Defendants would be entitled to qualified immunity. [R. 89, pp. 25–29]. The Defendants also suggest that Freeman's Equal Protection claims fail against the Defendants in their official capacities because

Freeman has failed to identify an unconstitutional policy, custom, or practice by Marshall County. *Id.* at 29.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Martinez v. White*, No. 19-5377, 2020 WL 1888855, at *2 (6th Cir. Feb. 20, 2020) (internal citation and quotation marks omitted). Freeman has brought his Equal Protection claim pursuant to § 1983, which "'creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere.'" *Howell v. Father Maloney's Boys' Haven, Inc.*, 424 F. Supp. 3d 511, 516 (W.D. Ky.), aff'd, 976 F.3d 750 (6th Cir. 2020) (quoting *Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001)). "Two elements are required to state a claim under Section 1983." *Id.* (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). "'A plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.'" *Id.* (quoting *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citations omitted). "'Absent either element, a section 1983 claim will not lie.'" *Id.* (quoting *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991)).

Taking the issues out of order, though Freeman attempts to bring Equal Protection claims against the Defendants in their official and individual capacities, a § 1983 "claim against a public employee in his official capacity is deemed to be a suit against the governmental entity, not a suit against the official personally." *Badder v. Schmidt*, 50 F. Supp. 3d 902, 918 (E.D. Mich. 2014) (citation omitted). And only where "the 'execution of a government's policy or custom . . . inflicts the constitutional injury,'" can "the local government [] be held liable under § 1983." *Weaver v. Louisville-Jefferson Cnty. Metro Gov't*, No. 3:24-CV-103-RGJ, 2024 WL 2819556, at *2 (W.D.

Ky. June 3, 2024) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Because Freeman has at no point alleged that Marshall County's policies or customs are responsible for the alleged constitutional violations by the individual Defendants, his official capacity claims against the Defendants (properly claims against the County) cannot proceed.

The Court turns, then, to Freeman's claims against the Defendants in their individual capacities. Generally, to prove an equal protection claim, the plaintiff must demonstrate that the government treated him disparately when compared to similarly situated persons, and that such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis. *See Buckley v. City of Westland*, No. 2:20-cv-11315, 2021 WL 2662255, *3 (citing *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)). Here, there is no argument nor evidence that a fundamental right has been burdened, and "disability is not a suspect class for equal protection purposes," *Eaves v. Ballard*, No. 20-5277, 2020 WL 8838012, at *2 (6th Cir. Nov. 3, 2020) (citations omitted). Thus, for Freeman "[t]o establish a violation of the Equal Protection Clause based on disability discrimination, [he] must show that there was no rational basis for the state action that treated [him] differently because of [his] disability." *Bullington v. Bedford Cnty., Tennessee*, 905 F.3d 467, 477 (6th Cir. 2018) (citation omitted); *see also Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 684 (6th Cir. 2016) (quoting *Tennessee v. Lane*, 541 U.S. 509, 522 (2004)) ("Disparate treatment 'based on disability' violates the Equal Protection Clause if it 'lacks a rational relationship to a legitimate governmental purpose.'"). "In bringing this claim, [Freeman] assumed the burden of showing that the defendants intentionally treated [him] differently—because he is disabled—than similarly situated [employees] who were like him in all relevant respects." *Gohl*, 836 F.3d at 684 (cleaned up) (citing *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 458 (6th Cir. 2008)).

Here, Freeman's Equal Protection claim fails because he has pointed to no similarly situated, non-protected individuals who were treated more favorably than he was. In fact, as the Defendants note, Freeman has acknowledged that his department as a whole has faced challenges with other departments and County officials.[10] *See* [R. 56 (Third Amended Complaint), ¶ 48] ("In or around July 20, 2021, Plaintiff read a formal statement to the Fiscal Court outlining the ongoing illegal work environment and continued retaliation he, and his employees, have been subjected to since his complaints of disability discrimination and sexual harassment, stating that it is preventing him from completing his job duties."); [R. 98 (Response), pp. 3–4] ("Defendant McGuire placed a black trash bag on the dispatch door. . . . This prevented Dispatch employees from accessing the kitchen, bathroom, the break room, and server room. . . . This was just the start of Defendant McGuire's ceaseless retaliation against Plaintiff."); *id.* at 8 ("Rachael Opiola, a dispatch employee during Plaintiff's tenure with the County, noted that a lot of 911's purchases would be denied by the Fiscal Court. . . . No other department's budget or purchases scrutinized like dispatch."). In other words, Freeman's own arguments seem to indicate that the entire 911 department faced at least some of the issues Freeman complains of, and not that Freeman was singled out because of his disability.

Nevertheless, in an attempt to allege disparate treatment, Freeman argues, "[r]egarding Defendant Spraggs, it is clear that his treatment of Plaintiff concerning his budget and spending is disparate to all other department heads and former 911 directors" and "it has become abundantly clear that no other County employee was treated similarly to Mr. Freeman." [R. 98, p. 8]. Yet, in doing so, Freeman broadly asserts that he was treated less favorably than "all" those who worked

---

[10] To the extent Freeman attempts to argue that his subordinates in the 911 department are apt comparators, this argument fails for the same reasons discussed below with respect to Judge Executive Neal. Freeman's supervisory role as the 911 Director would mean he is not "similarly situated" to his dispatchers and other subordinates "in all relevant respects." *Tree of Life*, 905 F.3d at 368.

for Marshall County and makes no attempt to identify how any specific individuals were similarly situated to him in all relevant respects. The only alleged comparator Freeman seems to point to is "Mr. Neal, Plaintiff's supervisor," who "was involved in anything that Plaintiff did which involved money" yet "there was never a petition of no confidence circulated against Mr. Neal for alleged extravagant and unnecessary spending." *Id.* at 9.

Even assuming Freeman did receive harsher criticism of his work than Judge Executive Neal, such as through the petition of no confidence, a "plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in all relevant respects." *Tree of Life Christian Schools v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018). Freeman's own characterization of Neal as his "supervisor" indicates that Neal was not "similarly situated" to Freeman "in all relevant respects." *Id.* More importantly, Freeman makes no attempt to otherwise explain how Judge Executive Neal was similarly situated to him, which typically involves showing they "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Morton v. Greater Cleveland Reg'l Transit Auth.*, No. 23-3660, 2024 WL 2765835, at *5 (6th Cir. May 30, 2024); *see also Santiago v. Meyer Tool Inc.*, No. 22-3800, 2023 WL 3886405, at *7 (6th Cir. June 8, 2023) ("[W]hat makes a plaintiff similarly situated to the non-protected employee in all relevant respects is fact-sensitive and to be determined on a case-by-case basis.") (cleaned up) (citation omitted). Freeman has made only cursory arguments concerning his disparate treatment as compared with Judge Executive Neal, and this is insufficient to carry his burden of establishing that Judge Executive Neal is an appropriate comparator.

In addition, as discussed with respect to his discrimination and retaliation claims, Freeman has presented no evidence that the Defendants "intentionally treated [him] differently—*because he is disabled*." *Gohl*, 836 F.3d at 684. Rather, the overwhelming evidence indicates that the Defendants were motivated by non-discriminatory disagreements with Freeman over policy (whether warranted or not), use of taxpayer funds, and the operation of the 911 center. In other words, Freeman cannot demonstrate that his treatment lacked a rational basis.

Because Freeman has failed to produce any evidence that a similarly situated employee was treated more favorably than he was, and because the record reflects that other employees not in Freeman's protected class, including his subordinates in the 911 department, were also subjected to the poor treatment that he was, Freeman's Equal Protection claim fails.

### D.  Remaining State Law Claims

At this juncture, having disposed of all Freeman's federal claims and his state law claims that were directly tied thereto (i.e., his KCRA claims), his only remaining claims are governed exclusively by state law. These include Freeman's Kentucky Whistleblower Act and KOSHA Retaliation claims against Marshall County (Counts IX and X), and his various tort claims against the individual Defendants (Counts III, IV, V, and VII).

In such a posture, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *See Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996), *amended on denial of reh'g*, No. 95-5120, 1998 WL 117980 (6th Cir. Jan. 15, 1998); *see also Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) ("Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction.  If the federal claims are dismissed

before trial, the state claims generally should be dismissed as well.") (internal quotation marks omitted); *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims.").

The Sixth Circuit has provided that a district court is "not required to provide an in-depth analysis of its reasoning" for declining supplemental jurisdiction because "declining to exercise supplemental jurisdiction after dismissing a federal claim of original jurisdiction is purely discretionary" and "remains a doctrine of discretion, not a plaintiff's right." *Miller v. Collins*, No. 23-3191, 2023 WL 7303305, at *4 (6th Cir. Nov. 6, 2023). Indeed, although a court *may* exercise supplemental jurisdiction over state law claims after having disposed of all federal claims through motions for summary judgment, *see Musson Theatrical*, 89 F.3d at 1255, courts often decline to do so.  *See Rothe*, 577 F.3d at 709 (reviewing district court's grant of summary judgment and observing, "[u]pon dismissing Brooks's federal claims, the district court properly declined to exercise supplemental jurisdiction over Brooks's remaining state-law claims"); *Weser v. Goodson*, 965 F.3d 507, 518-19 (6th Cir. 2020); *Dunn v. Adams, Stepner, Woltermann & Dusing, PLLC*, No. CV 19-4-DLB-CJS, 2021 WL 3410042, at *8 (E.D. Ky. Aug. 4, 2021).

"In determining whether to exercise supplemental jurisdiction, federal courts balance the values of judicial economy, convenience to parties, fairness, and comity to state courts." *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011) (citations omitted). "Comity to state courts is considered a substantial interest; therefore, this Court applies a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed—retaining residual jurisdiction 'only in cases where the interests of judicial economy

and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues.'" *Id.* (citations omitted).

Here, the Court perceives no unique circumstances on this record that suggest an exercise of supplemental jurisdiction over Freeman's remaining claims would be advisable. *See Dunn*, 2021 WL 3410041, at *8; *see also Fox v. Brown Mem'l Home, Inc.*, 761 F. Supp. 2d 718, 723–24 (S.D. Ohio 2011) (courts should weigh, among other factors, "comity, fairness, and judicial economy"). The first factor, comity to state courts, certainly counsels in favor of dismissing Freeman's remaining claims without prejudice. Freeman's Kentucky Whistleblower Act and Kentucky OSHA Retaliation claims against Marshall County (Counts IX and X), and his various tort claims against the individual Defendants (Counts III, IV, V, and VII), are all governed by Kentucky law, and are areas in which state court adjudication seems advisable. As for fairness to the parties, the Court notes that the Defendants have requested that the Court decline to exercise jurisdiction over Freeman's state law claims. *See* [R. 89, p. 28] ("Given Freeman's failure to establish a viable federal claim which would vest this Court with jurisdiction pursuant to 28 USC § 1331 and 1343, this Court should not exercise supplemental jurisdiction over his remaining state law claims."). And for his part, Freeman did not even address this argument in his response brief. The Court further notes that this case has only been pending for approximately two years, and the operative Complaint was filed just over one year ago. *See* [R. 56 (Third Amended Complaint)]. And the instant Motion for Summary Judgment, [R. 56], was filed only seven months after the operative Complaint was filed. All this to say, the parties have not expended so much time and effort into this case that it would render dismissal of the remaining claims without prejudice fundamentally unfair.

Nor would doing so be contrary to the principles of judicial economy. Upon review of the parties' briefing on the remaining state law claims, neither has done a sufficient job arguing their respective positions. For example, on Freeman's Kentucky Whistleblower Act and Kentucky OSHA Retaliation claims[11] against Marshall County, neither party provides any helpful case law and, in fact, Freeman cites no case law at all. Similarly, the Defendants' argument for summary judgment on all four of Freeman's state law tort claims consists of the following paragraphs in their motion:

> The remaining state law claims are all premised upon a finding of intentional harm done to Freeman for nefarious and unjustified reasons. But such finding is unsupported by the record. Each of the Defendants has a vested interest in the success of the County and the protection of the taxpayer dollars in its care. And importantly, each of these Defendants has the right to express criticisms of a public official, such as the 911 Director. Thus, for the same reasons that Freeman's federal claims have failed, each of these remaining state law claims likewise fail, and the Marshall County Defendants are entitled to judgment as a matter of law.

[R. 89, p. 30], as well as these additional paragraphs in their reply:

> In his Response, Freeman argues that there is an issue of material fact on the remaining tort claims. . . . But, that is not necessarily true – the sequence of events between the parties is largely undisputed. The only remaining dispute stems from Freeman's perception of these events – Freeman believes that Defendants' criticisms of his job performance were motivated by discriminatory or retaliatory intent. But, the existence of this dispute is not sufficient to create a genuine issue of material fact, because Freeman has failed to demonstrate any evidence which objectively supports his belief as to Defendants' motivations.
>
> Freeman has failed to proffer sufficient evidence to support his tortious interference with a business relationship, defamation, intentional infliction of emotional distress, and invasion of privacy/false light claims. Indeed, as with his other claims, Freeman has failed to proffer any evidence (other than his own suspicions) which demonstrates discriminatory or improper intent by any Defendant. Thus, his claims fail.

---

[11] This is in contrast to the KCRA retaliation claim, which was discussed in more detail by the parties and which was directly related to the allegations of retaliation arising under federal law.

[R. 100, p. 12]. The point is, the parties have largely undeveloped their positions on these various state law claims, and the Court will not do their work for them. Judicial economy therefore supports dismissing these claims without prejudice and allowing the parties to pursue them more thoroughly in state court.

For all these reasons, having disposed of some of Freeman's state law claims and all of his federal claims, which gave the Court original jurisdiction in this federal question action, the Court finds that his remaining state law claims should be resolved by a state court. *See Aquilina v. Wriggelsworth*, 759 F. App'x 340, 348 (6th Cir. 2018) (characterizing "grant of summary judgment on federal claims as one form of 'pretrial dismissal,' after which 'the balance of considerations usually will point to dismissing the state law claims, or remanding them'" and concluding district court did not abuse its discretion after it "determined that 'a state court should have the opportunity to consider the merits of the [remaining] state law claim" following summary judgment ruling on federal claims). Consistent with Sixth Circuit precedent, the Court will decline to exercise supplemental jurisdiction over Freeman's remaining state law claims and will dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c).

## IV.     CONCLUSION

For all these reasons, **IT IS HEREBY ORDERED** as follows:

1.      The Defendants' Motion for Summary Judgment [**R. 89**] is **GRANTED**.

   a.   Summary judgment is **GRANTED** in favor of the Defendants **on Counts I, II, VI, and VIII**.

   b.   The Court declines to exercise supplemental jurisdiction over the remaining state law claims, **Counts III–V, VII, IX, and X**, and they are **DISMISSED without prejudice**.

- 45 -

2.      A separate judgment shall issue.

This the 11th day of September, 2024.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

Cc: Counsel of Record